MANHAT v. UNITED STATES et al.

LATIFF v. UNITED STATES et al.

United States District Court
S. D. New York.

June 30, 1953.

596

Harry R. Schwartz, Brooklyn, proctor for libelant Gavoer Manhat.

Harry Lieboff, New York City, proctor for libelant Roslie Latiff.

J. Edward Lumbard, Jr., U. S. Atty., Southern District of New York, New York City (Howard F. Fanning, New York City, of counsel), proctor for respondent United States.

Purdy, Lamb & Catoggio, New York City (Vincent A. Catoggio, New York City, of counsel), proctors for impleaded respondent Stuart Marine Painting Corp.

Renato C. Giallorenzi, New York City (Joseph A. McKinley, New York City, of counsel), proctor for impleaded respondent Project Const. Corp.

MURPHY, District Judge.

This is a consolidated action by two workmen who were injured as a result of a lifeboat falling from the S. S. General Hodges while she was tied up at a pier in Brooklyn. The men were employees of Stuart Marine Corporation and are suing the owner of the vessel, the United States, and the Project Construction Corporation who held the contract with the United States for repair of the ship. The United States in turn has interpleaded the Project Construction and Stuart Marine Corporation on a theory of liability over pursuant to an indemnity agreement in the contract.

The action was tried by the court and the following are made

## Findings of Fact

1. At the time of the accident three employees of Stuart Marine Painting Corporation, namely, the libelants, Manhat and Latiff, together with one Raymond Rosa, were working in a lifeboat which was suspended over the side of the S. S. General Hodges directly above the pier. These three men had been directed to scrape, clean and dust the interior of the lifeboat by May Lah, their immediate foreman, who was likewise in the employ of Stuart.

2. This lifeboat was an all aluminum hull, about 27 feet long, 8 feet wide, 3½ feet deep, weighing 2½ tons and designed to accommodate 43 persons. It was equipped with what is known as the Rottmer-type releasing gear. The release handle, when it was in a secured position, pointed towards the port side of the boat and lay flat flush with the boards on the bottom of the boat resting in a keeper. There were holes in the handle and the keeper for the insertion of a toggle pin. The release handle was painted red and there was a sign bearing the word, "Danger" above the handle.

3. The lifeboat could not be disengaged from the falls unless the release handle was pulled up and over. The handle from its secured position must describe an arc of 165–170 degrees before the lifeboat is disengaged from the falls. When empty, pressure of 25–30 lbs. must be exerted to pull up the handle, which itself weighed from 3 to 5 lbs.

4. The lifeboat had been put through a "man overboard test" on March 15, 1951 while The General Hodges was at sea, released from its falls and thereafter put back in its cradle on deck. On March 19, 1951, this lifeboat was again put over the side, lowered to C deck and its gear inspected.

5. On the morning of April 4, 1951, the lifeboat was put over the side to permit the crew to chip and paint the deck in the way of the boat. It was secured so that the tops of the gunnels were about flush with the boat or B deck. It remained suspended in its falls until it fell at the time of the accident. At the time it was put overboard the handle of the releasing gear was in its keeper.

6. Libelant, Manhat, had been to sea on British vessels from 1936 to 1939 and had taken part in many lifeboat drills. During the winter months he worked as a ship cleaner from about 1942 to the time of his accident, except for a period of about four months in 1943 when he was in the Army. He was familiar with lifeboats and their releasing gear.

7. Libelant, Latiff, a national of the Republic of Indonesia, landed in the United States in December of 1941 and was taken into custody by the Immigration authorities. After hearing, he was ordered deported and a warrant of deportation issued under date of December 22, 1941. He left the United States in the steamship Yorba Linda on January 17, 1942. He re-entered the United States in the steamship El Nil on June 10, 1943. He was again taken into custody and given a hearing before a Special Board of the Immigration and Naturalization Service. That Board ordered him excluded. He appealed to the Board of Immigration Appeals. That Board affirmed the order of exclusion but permitted him to depart as a seaman and granted the exercise of subdivision i of Section 3 of the Immigration Act of 1917, 8 U.S.C.A. § 136 (i). This permitted him to ship foreign and to land again in the United States to remain only for the period of twenty-nine days or for the period when the ship in which he reached the United States departed, whichever was the shorter. The extent of his rights under subdivision i of Section 3 of the Immigration Act of 1917 was fully explained to him through an interpreter when he was granted permission to leave the United States as a seaman. He re-entered the United States February 21, 1949 and worked ashore continuously from that date until the day of the accident. Latiff had

also served on deck on British vessels. In 1943 he received an ABS ticket and a lifeboat certificate. Thereafter he went to sea in American and other vessels. He was familiar with the releasing gear of lifeboats.

8. In the afternoon of April 5, 1951, after libelants had been working for two days on the General Hodges and that morning in lifeboats on the port side, the foreman, May Lah, told them and Rosa to get in the lifeboat which had been swung over the side on the previous day, in order to scrape, dust and paint it. He warned them not to touch the handle of the releasing gear. He noted that the releasing gear handle was in the secured position in its keeper.

9. Fifteen minutes later the lifeboat fell to the pier below. Immediately thereafter the handle of the releasing gear was found in the completely released position, the falls were intact as were the shackles attached to them and the links which had been connected to the hooks in the lifeboat.

10. As a result of the fall, libelant Manhat sustained a triple fracture of the right ankle, comminuted, injury to his right shoulder, a cut to the bone on his left leg and an everted right foot. Libelant Latiff sustained severe injury to his right leg.

Discussion

Several questions are raised in this action, among them the matter of fault on the part of the shipowner, the right of the shipowner to indemnity from Stuart Marine Painting Corporation and Project Constructing Corporation, impleaded respondents, and whether libelant Latiff has standing to sue in this court to recover damages for personal injuries in view of his status as an alien who entered this country illegally.

The heart of our inquiry is the fault of the shipowner. Libelants contend that, as employees of a contractor working on the lifeboats, they were "business invitees" entitled to a safe place to work. This was not provided by the shipowner, it is argued, because (1) the lifeboat in question was swung overside when it could have been cradled or lashed, (2) unnecessary debris and ropes were scattered in the boat, and

598

(3) the lifeboat fell as it did under the circumstances of this case. We consider these points in that order.

(1) At the outset it is clear that the basis of liability cannot be that of the shipowner's obligation to provide a seaworthy ship under the doctrine of The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. See Lynch v. U. S., 2 Cir., 163 F.2d 97, 99. At most such liability must consist of fault in failure of the shipowner to provide an employee of a subcontractor for repairs aboard the ship with a safe place to work. We put aside consideration of what specifically this duty might amount to in the case of libelant Latiff suing in this court for injuries sustained while an alien illegally within the United States. So far as libelant Manhat is concerned, a shipowner's duty to an employee of a subcontractor injured while on board has been variously stated as that which is owed to a "business guest." The New York decisions do not distinguish the measure of care due to a "business guest" from that due from his employer to an employee. At least one case indicates that the duty is limited to pointing out dangers and embraces no affirmative provisions for safety of the "guest" while on the premises; other cases suggest possibly that failure to use reasonable care to provide for the "guest's" safety is a breach of duty, even though the danger be apparent. Cases collected, Guerrini v. United States, 2 Cir., 167 F.2d 352, 355, notes 13–15. For purposes of this case, we adopt the latter maximum statement as the measure of the shipowner's duty.

Libelants were fully aware of the method and consequence of release of the disengaging handle in the lifeboat. Both of them had been seamen who participated in lifeboat drills. Each testified that they were fully aware of the dangers involved and had been warned not to touch the handle and did not touch it. And the handle was painted red with a sign above it bearing the word "Danger." There is direct evidence that the release handle was in a secured position, i. e., pointing toward the port side, laying flat flush with the boards on the bottom of the lifeboat, and resting in its keeper, at the time the libelants and the third man entered the boat. Immediately after the accident, the release handle was in an open position and laying flat, pointing toward the starboard side of the lifeboat. Although there was testimony that a toggle pin was not inserted in the holes for that purpose in the handle and keeper at the time the men entered the lifeboat, it is clear that movement of the handle from secured to release position thus disengaging the lifeboat from its falls was not likely to be accomplished inadvertently. The handle would have to be moved through an arc of almost a semi-circle under pressure of more than 25 lbs. Moreover there is no evidence that the releasing gear was defective prior to the accident. Indeed the lifeboat and its releasing mechanism had been tested and observed on two occasions within a three-week period preceding the accident. A "hog" or upward bend in the base pipe of the releasing gear, causing the gear to "freeze" in position of complete release, occurred at the time the lifeboat struck the wharf.

These facts, coupled with failure of libelants to suggest any cause for the fall of the lifeboat, point to the probable inference that the boat fell because the releasing gear was removed by someone from the secured position in the keeper to one of complete release. Nevertheless libelants claim that a custom and practice existed to secure all lifeboats when suspended over the side of a vessel with additional lashing but their evidence falls short of the requisite preponderance in establishing that such was the case. At most, lashing of lifeboats is not an invariable practice and occurs primarily when the work being done is on the releasing gear, the main falls or the tank in the interior of the lifeboats.

Apart from the question of the existence of a custom to lash lifeboats in which men are working, the utility of the practice should be considered in determining whether or not the shipowner provided libelants with a safe place to work. Lashing is a time-consuming operation requiring about an hour's labor, as compared with the more simple device of nesting or cradling the lifeboat. Again, for painting and scraping,.

it may often not be feasible to lash a lifeboat in a single immovable position.

Moreover, permitting men who are fully informed concerning the operation of its releasing gear to work in a lifeboat swung overside, does not create a risk of harm to such men sufficiently appreciable to command general attention. Conceivably, there are safer positions for a lifeboat undergoing scraping and painting, but whether such alternate positions would be equally efficacious is open to some doubt. Certainly a window-washer on the ground can work with more safety than one on an upper-story ledge of a skyscraper, but recurring removal and replacement of the panes would make the game not worth the candle.

(2) Fragmentary evidence that bits of debris and strands of rope unnecessarily encumbered the lifeboat cannot serve as proof of fault in the face of the evidence that if such materials were present they could not in fact cause the handle of the mechanism to change from secured to release position.

(3) The doctrine of *res ipsa loquitur* cannot properly be invoked by libelants against the shipowner in the light of evidence pointing to the probable cause of the accident and when the instrumentality causing harm was not in the latter's exclusive control. See The Mercier, D.C.D.Or., 5 F. Supp. 511, 512, affirmed without opinion, Anderson v. Compagnie Maritime Belge Society, 9 Cir., 72 F.2d 1008.

This disposition makes unnecessary consideration of the other questions seemingly involved in this case. In the absence of negligence, libelants have only a remedy for unquestionably severe injuries under appropriate compensation statutes which do not make fault the touchstone for shifting the cost of such harm.

Conclusions of Law

1. This court has jurisdiction of the parties and subject matter of this controversy.

2. Neither respondent United States of America nor Project Construction Corporation was negligent in producing injuries sustained by libelants.

3. The libels are accordingly dismissed. Settle order.